# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPECTRUM PHARMACEUTICALS, INC.<br>and UNIVERSITY OF STRATHCLYDE,<br>　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>INNOPHARMA, INC.,<br>　　　　　　　　　Defendant. | C.A. No. 12-260 (RGA) (CJB) |

## OPENING CLAIM CONSTRUCTION BRIEF
## OF DEFENDANT INNOPHARMA, INC.

Barry M. Klayman (#3676)
COZEN O'CONNOR
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2035
Facsimile: (215) 701-2209
E-mail: BKlayman@cozen.com

*Attorneys for Defendant,*
*InnoPharma, Inc.*

*Of Counsel:*

Richard T. Ruzich (*Pro Hac Vice*)
COZEN O'CONNOR
333 W. Wacker Drive, Suite 1900
Chicago, IL 60606


Barry P. Golob (*Pro Hac Vice*)
W. Blake Coblentz (*Pro Hac Vice*)
Aaron S. Lukas (*Pro Hac Vice*)
COZEN O'CONNOR
1627 I Street, NW, Suite 1100
Washington, DC 20006

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND OF THE TECHNOLOGY ......................................................2

III.    PATENT-IN-SUIT ...............................................................................................2

IV.     PRINCIPLES OF CLAIM CONSTRUCTION ..................................................3

V.      ARGUMENT .......................................................................................................5

        A.     Construction of the "Mixture" Claim Terms Should Reflect the Claimed
               Invention Contains a Detectable Amount of (6R) Diastereoisomer and
               Excludes Pure (6S) Diastereoisomer. .................................................. 5

               1.     Without Specifying that Each Diastereoisomer is Present in a Detectable
                      Amount, the "Mixture" Terms are Ambiguous. ........................................ 7

               2.     InnoPharma's Construction is Supported by the Intrinsic Evidence. ......... 8

        B.     Construction of the "Balance" Claim Terms Should Reflect the Fact That
               the Claimed Invention Contains a Detectable Amount of (6R)
               Diastereoisomer. .................................................................................. 10

        C.     Construction of the Percentage Claim Terms Should Reflect an Upper
               Limit of (6S) Diastereoisomer No Higher Than 98 Percent. ............................... 11

               1.     InnoPharma's Constructions are Consistent With the Specification and
                      Claim Language. .................................................................................. 12

               2.     InnoPharma's Constructions Are Consistent With the Prosecution History.
                      .......................................................................................................... 13

        D.     Construction of "A pharmaceutical composition for therapeutic use"
               Should Reflect a Composition in a Final Form. ......................................... 15

        E.     Construction of the "therapeutic use" Terms in Claims 5-14 Should Be
               Limited to Treatment of Colorectal Cancer. ........................................... 16

        F.     The Pharmaceutically Acceptable Claim Terms Should Be Given Their
               Plain Meaning. ..................................................................................... 18

        G.     The Claim Terms Using "at least about" Are Indefinite....................................... 19

               1.     "at least about" As Used in Claims 5, 7, 10, and 12 is Indefinite............. 20

               2.     "at least about" As Used in Claims 6 and 11 is Indefinite....................... 22

H.    The Claim Term "polar solvent" is Indefinite. ...................................................... 23

VI.    CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)...................................................................5

*Amgen, Inc. v. Chugai Pharm. Co.*,
    927 F.2d 1200 (Fed. Cir. 1991)...........................................................20, 22

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012).................................................................18

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*,
    268 F.3d 1352 (Fed. Cir. 2001)...................................................................4

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006).....................................................................6

*Computer Docking Station Corp. v. Toshiba Am., Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)...................................................................4

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005).......................................................22, 23, 24

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
    672 F.3d 1270 (Fed. Cir. 2012)...................................................................7

*Ekchian v. Home Depot, Inc.*,
    104 F.3d 1299 (Fed. Cir. 1997).................................................................10

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1066 (2000)...........................................3

*ERBE Elektromedizin GmbH v. Canady Tech., LLC*,
    629 F.3d 1278 (Fed. Cir. 2010).................................................................15

*Every Penny Counts, Inc. v. Am. Express Co.*,
    563 F.3d 1378 (Fed. Cir. 2009)...................................................................5

*Fujinon Corp. v. Motorola, Inc.*,
    No. 07-533, 2009 U.S. Dist. LEXIS 83088 (D. Del. Sept. 11, 2009).......................................5

*Glaxo Group Ltd. v. Teva Pharms.*,
    2009 U.S. Dist. LEXIS 37494 (D. Del. Apr. 30, 2009)............................................5

iii

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
222 F.3d 951 (Fed. Cir. 2000) ................................................................................................14

*Housey Pharm., Inc. v. Astrazeneca UK Ltd.*,
366 F.3d 1348 (Fed. Cir. 2004) ..............................................................................................18

*In re '318 Patent Infringement Litig.*,
583 F.3d 1317 (Fed. Cir. 2009) ..............................................................................................18

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) ..................................................................................................................3

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) .......................................................3

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) ................................................................................................4

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir. 2005) ................................................................................................4

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ..............................................................................................21

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
435 Fed. Appx. 927 (Fed. Cir. 2011) .............................................................................18, 19

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ................................................................................................9

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................................................................3, 4, 13

*Quantum Corp. v. Rodime, PLC*,
65 F.3d 1577 (Fed. Cir. 1995) ................................................................................................21

*Rheox, Inc. v. Entact, Inc.*,
276 F.3d 1319 (Fed. Cir. 2002) ..............................................................................................10

*Standard Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985) ..........................................................................................22, 23

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ............................................................................................5, 6

*Utimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009) ..............................................................................................23

1654032011

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006)................................................................4

*Young v. Lumenis, Inc.*,
    492 F.3d 1336 (Fed. Cir. 2007)..............................................................23

**Statutes**

35 U.S.C. § 102(b) .................................................................................10

35 U.S.C. § 112 ......................................................................................12

35 U.S.C. § 112, first paragraph ............................................................9

35 U.S.C. § 112, second paragraph................................................ passim

**Other Authorities**

R. C. Kahrl, *Patent Claim Construction* (2010) ....................................3

U.S. Patent No. 6,500,829.............................................................. passim

16540320\1

## I.   INTRODUCTION

Defendant InnoPharma, Inc. ("InnoPharma") respectfully submits this brief in support of its claim construction positions for the disputed terms of U.S. Patent No. 6,500,829 ("the '829 patent").

Plaintiffs Spectrum Pharmaceuticals, Inc. ("Spectrum") and University of Strathclyde (collectively, "Plaintiffs") are asserting certain claims of the '829 patent against InnoPharma to prevent InnoPharma from lawfully selling its proposed generic version of Spectrum's Fusilev® injectable drug product.  The '829 patent is the only patent listed in the FDA's Orange Book for its New Drug Application for Fusilev®.

Although the parties have identified a large number of disputed claim terms, InnoPharma has grouped similar terms together to aid the Court's analysis.  Through its proposed constructions, InnoPharma either abides by the plain language of the claim or adheres to the intrinsic evidence, commensurate with the scope of the alleged invention.  In contrast, through its proposed constructions, Plaintiffs stray from either the plain meaning or ignore the intrinsic evidence altogether, presumably to extend the claim scope beyond what the inventors are entitled and to ensnare a potential generic seller through ambiguous claim language.

For example, each of the asserted claims of the '829 patent require a "mixture of (6S) and (6R) diastereoisomers" and "the balance of said compound/composition consisting of the (6R) diastereoisomers."  Moreover, the asserted claims of the '829 patent require a certain percent range of the (6S) diastereoisomer be present in the claimed composition/compound.  As explained in detail below, InnoPharma's proposed constructions of these terms properly account for the presence of the (6R) diastereoisomer in the claimed mixture, while Plaintiffs' construction does not.  InnoPharma's proposed constructions of these terms adhere to the arguments made by the Applicants during prosecution of the '829 patent, while providing a

1

potential generic seller with clarity as to the metes and bounds of the claims. On the other hand, Plaintiffs' proposed constructions not only ignore the arguments made by the Applicants during prosecution in an attempt to recapture already narrowed claim scope, but also create ambiguity as to the metes and bounds of the claims.

For the reasons set forth below, InnoPharma respectfully submits that the Court should construe the disputed terms consistent with their plain meaning or through adherance to the intrinsic record and thereby reject Plaintiffs' proposed constructions.

## II.    BACKGROUND OF THE TECHNOLOGY

Leucovorin, also known as folinic acid, was first identified in the late 1940s and has long been used as a rescue agent for cancer patients. Leucovorin has two chiral centers, and is composed of equal amounts of two diastereoisomers, (6R) leucovorin and (6S) leucovorin. *See* Declaration of Joe P. Foley, Ph.D. in Support of Innopharma's Opening Claim Construction Brief ("Foley Decl.") at ¶ ¶ 10-25.[1]

The prior art established that (6S) leucovorin is therapeutically effective as a methotrexate rescue agent and in combination with 5-fluorouracil for treating certain types of colorectal cancer. '829 patent at col. 1, ll. 57-61. Additionally, some investigators in the prior art even hypothesized that (6R) leucovorin may inhibit the therapeutic function achieved by the (6S) diastereoisomer. *See id.* at col. 1, l. 62 to col. 2, l. 12.

## III.    PATENT-IN-SUIT

The process disclosed in the '829 patent involves: (1) attaching a chiral auxiliary group to precursors of the chosen diastereoisomers in a mixture so as to form a pair of new diastereoisomers; (2) partially separating the pair of new diastereoisomers and recovering the

---

[1] Paragraphs 10-25 in Dr. Foley's declaration provide scientific and technological background information helpful to understanding the issues presented in this case.

new diastereoisomer ((6R) or (6S)) so formed; and (3) converting the isolated, substantially pure new diastereoisomer into the corresponding desired diastereoisomer. '829 patent col. 2, ll. 45-67; Foley Decl. at ¶ 27. The separation process described in the '829 patent involves repeated butanol extractions. '829 patent at Figure 4; Foley Decl. at ¶ 28. This process was claimed in U.S. Patent No. 4,959,472, which is expired. Plaintiffs are asserting claims 1, 2, and 5-14 of the '829 patent against InnoPharma. Representative claim 1 is recited below:

> A pharmaceutical composition for therapeutic use which consists essentially of a therapeutically effective amount sufficient for the treatment of human beings for methotrexate rescue or folate deficiency, of a pharmaceutically acceptable compound which is a (6S) diastereoisomer selected from the group consisting of (6S) leucovorin (5-formyl-(6S)-tetrahydrofolic acid) and pharmaceutically acceptable salts and esters of (6S) leucovorin; wherein the compound consists of a mixture of (6S) and (6R) diastereoisomers and consists of at least 92% by weight of the (6S) diastereoisomer, the balance of said compound consisting of the (6R) diastereoisomer; in combination with a pharmaceutically acceptable carrier.

## IV.    PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction "is the process by which the courts determine the true meaning of the claims of a patent." R. C. Kahrl, *Patent Claim Construction*, 1-3 (2010). It is a matter of law reserved exclusively for the Court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 975 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1066 (2000). In construing patent claims, the Court should diligently seek the true meaning of the claims from the public record (*i.e.*, the "intrinsic evidence")—the claims, the specification, and the prosecution history—without reference to *ex post facto* subjective impressions or opinions of the inventor or prosecution attorney. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 987 (Fed. Cir. 1995), *aff'd*, 571 U.S. 370 (1996).

A proper construction of claim terms focuses first on the words of the claims themselves. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Claim terms must be interpreted in a way that gives meaning to each and every word. *See, e.g., id.* at 1314.

3

Upon reviewing the words of the claims themselves, the Court attempts to give each claim term its ordinary and customary meaning as it would have been understood by a person of ordinary skill in the relevant art at the time of the invention. *See id.* at 1312–13. The person of ordinary skill, however, is not deemed to have read the claim terms in a vacuum but rather in the context of both the specification and the prosecution history (*i.e.* the intrinsic evidence). *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

The intrinsic evidence is the most important consideration for the Court when construing a disputed claim term. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007). The specification may determine the proper construction of a term. *See Phillips*, 415 F.3d at 1315. Nevertheless, while the specification is important in claim construction, the Court must be mindful not to limit the claims to the preferred embodiments disclosed in the specification. *See id.* at 1323.

Statements made by the inventor during prosecution may also affect the scope of a claim or the meaning of a claim term. *See*, *e.g.*, *Computer Docking Station Corp. v. Toshiba Am., Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). For example, an inventor can limit the meaning of a term by "advis[ing] the examiner (and the public after patent issuance) that a particular structure is not within his invention . . . ." *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1359 (Fed. Cir. 2001). Such statements may arise during prosecution of the patent itself, during prosecution of related patent applications, or during the re-examination of a patent. *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1184 (Fed. Cir. 2006). Although the emphasis in claim construction should remain on the intrinsic evidence, courts are authorized to rely on extrinsic evidence if necessary. *See Phillips*, 415 F.3d at 1317.

16540320\1

The primary purpose of claim construction is to "resol[ve] disputed meanings and technical scope, [and] to clarify and when necessary to explain what the patentee covered by the claims." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). *See also Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1381 (Fed. Cir. 2009) ("[t]he purpose of claim construction is to determine the meaning and scope of the patent claims"); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) ("'[c]laim construction' is for the purpose of explaining and defining terms in the claims"). Consistent with this purpose, a court should not adopt proposed constructions that "do little to reduce either the ambiguity or risk of confusion" regarding the claim terms. *See Fujinon Corp. v. Motorola, Inc.*, No. 07-533, 2009 U.S. Dist. LEXIS 83088, at *29 (D. Del. Sept. 11, 2009). *See also Glaxo Group Ltd. v. Teva Pharms.*, 2009 U.S. Dist. LEXIS 37494, at *12 (D. Del. Apr. 30, 2009) (declining to adopt a proposed construction that would not clarify the claim terms but instead would introduce ambiguity).

## V.  ARGUMENT

### A.  Construction of the "Mixture" Claim Terms Should Reflect the Claimed Invention Contains a Detectable Amount of (6R) Diastereoisomer and Excludes Pure (6S) Diastereoisomer.

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "the compound consists of a mixture of (6S) and (6R) diastereoisomers" (claim 1) | the pharmaceutically acceptable compound is a mixture of (6S) and (6R) diastereoisomers of leucovorin | the pharmaceutically acceptable compound consists of a mixture of (6S) and (6R) diastereoisomers in detectable amounts |
| "the composition consists of a mixture of (6S) and (6R) diastereoisomers" (claim 5) | the pharmaceutically acceptable composition is a mixture of (6S) and (6R) diastereoisomers of leucovorin | the pharmaceutically acceptable composition consists of a mixture of (6S) and (6R) diastereoisomers that contain both diastereoisomers in detectable amounts |
| "a mixture of: a (6S) diastereoisomer selected from the group consisting of (6S) | a mixture of: a (6S) diastereoisomer selected from the group consisting of (6S) | a mixture of a (6S) diastereoisomer and the (6R) diastereoisomer thereof that |

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| leucovorin (5-formyl-(6S)-tetrahydrofolic acid) and pharmaceutically acceptable salts and esters of (6S) leucovorin and the (6R) diastereoisomer thereof" (claim 10) | leucovorin (5-formyl-(6S)-tetrahydrofolic acid) and pharmaceutically acceptable salts and esters of (6S) leucovorin and the (6R) diastereoisomer thereof | contain both diastereoisomers in detectable amounts, wherein the (6S) diastereoisomer is selected from the group consisting of (6S) leucovorin (5-formyl-(6S)-tetrahydrofolic acid) and pharmaceutically acceptable salts and esters of (6S) leucovorin |

The "mixture" terms identified above limit every claim of the '829 patent.[2] The parties agree that the "mixture" terms refer to a mixture of (6S) and (6R) diastereoisomers of leucovorin. However, the parties disagree about whether the recitation of a mixture of (6S) and (6R) diastereoisomers requires both diastereoisomers to be present in a detectable amount. Plaintiffs' proposed construction does not address this question and deliberately provides no context for construing the claim language. Furthermore, Plaintiffs' proposed construction does nothing to clear up the ambiguity of how much of each diastereoisomer needs to be present in order to be considered a mixture. The claim construction should recognize this. *U.S. Surgical Corp.*, 103 F.3d at 1568 (claim construction is intended "to clarify and . . . explain what the patentee covered by the claim.").

In contrast, InnoPharma's proposed construction clearly defines each diastereoisomer needs to be present in a detectable amount in order to be considered a mixture. Additionally, InnoPharma's proposed construction is consistent with the specification and prosecution history of the '829 patent. Thus, the Court should construe the "mixture" terms to include detectable amounts of each of the (6R) and (6S) diastereoisomers.

---

[2] Asserted claim 2 depends from claim 1. Asserted claims 6-9 depend from claim 5. Asserted claims 11-14 directly or indirectly depend from claim 10.

**1.    Without Specifying that Each Diastereoisomer is Present in a Detectable Amount, the "Mixture" Terms are Ambiguous.**

Specifying that each of the (6R) and (6S) diastereoisomers is present in detectable amounts gives meaning to each term in the claims of the '829 patent.  For instance, the claims separately require both (6R) and (6S) diastereoisomers in the "mixture," establishing that each are distinct and required components of the patented invention.  Reading the claims to allow (6R) diastereoisomer in an amount that is not detectable would make each of the "(6R) diastereoisomer[s]" and "mixture" limitations meaningless.  The (6S) diastereoisomer with an undetectable amount of (6R) is not a mixture, it is "pure" (6S) diastereoisomer.  Foley Decl. at ¶ 62.  Such a construction is contrary to Federal Circuit precedent, which instructs that claims be construed "such that words in a claim are not rendered superfluous."  *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274-75 (Fed. Cir. 2012) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).  InnoPharma's construction correctly gives meaning to every word in the claims.  *See* Foley Decl. at ¶¶ 60-62.

Furthermore, specifying that each of the (6R) and (6S) diastereoisomers is present in detectable amounts provides clarity to the claims of the '829 patent.  A person of ordinary skill in the art would understand whether or not they are potentially infringing this limitation of the claims because of the understanding that a detectable amount of each diastereoisomer is required to infringe this limitation of the claims.  Under Plaintiffs' proposed construction, a person of ordinary skill is left in the dark.  Although the '829 patent specification describes one way of preparing a compound or composition consisting of a "substantially pure" (6S) diastereoisomer, the claims are not limited to that method of preparation.  Thus, a person of ordinary skill in the art practicing any method of preparing such a compound may obtain a composition that does not contain a detectable amount of (6R) diastereoisomer, but still may be accused of infringement

because the patentee states that the potential infringer could have (6R) diastereoisomer in the composition or compound, it is just not detectable. Simply put, under Plaintiffs' proposed construction, a person of ordinary skill in the art could not determine the metes and bounds of the claims to determine infringement.

### 2.    InnoPharma's Construction is Supported by the Intrinsic Evidence.

The specification and prosecution history support InnoPharma's constructions, because both make clear that the '829 patent claims are directed to mixtures that require detectable amounts of each of the diastereoisomers, and not "pure" (6S) diastereoisomer. The specification of the '829 patent states that the invention relates to the preparation of "substantially pure" diastereoisomers. '829 patent at title; col. 1, l. 16; col. 2, l. 48 and 58; col. 4, ll. 25-38 and 64; col. 5, ll.10-13. The specification defines "substantially pure" as "the purity of a diastereoisomer of greater than 75%, preferably greater than 80% or 90%, and most preferably greater than 95%." *Id*. at col. 4, ll. 25-28. Accordingly, the specification supports InnoPharma's constructions by recognizing that the diastereoisomers prepared are only "substantially pure," and not "pure" (6S) diastereoisomer.

Further, neither the specification nor the intrinsic record provide any suggestion that Applicants were in "possession" of a leucovorin composition in which the (6R) diastereoisomer was not detectable. Indeed, as noted above, the plain language of each and every asserted claim of the '829 patent recites a mixture that "consists of" the "(6S) and (6R) diastereoisomers." *See* the '829 patent, *e.g.*, claims 1, 5, and 10. Thus, the asserted claims of the '829 patent only cover compositions that include both the (6S) and (6R) diastereoisomers of leucovorin. During prosecution of the '829 patent, Applicants submitted a declaration that discussed three analytical methods used to determine diastereoisomeric purity and stated that, "there is an intrinsic error of plus or minus 3-4% in any of the purities determined by method (ii)" and that "the

diastereoisomeric purity of the (6S) leucovorin produceable according to the present invention is fairly characterised as being at least 95% (the balance being the (6R) diastereoisomer)." Declaration of W. Blake Coblentz in Support of InnoPharma, Inc's Opening Claim Construction Brief ("Coblentz Decl.") Exh. 1 at SPPI_INNO0000482.  Thus, it is unequivocal that Applicants were in possession of only compositions that included both the (6S) and (6R) diastereoisomers of leucovorin.  As a result, to the extent that any of the asserted claims of the '829 patent are construed to not require a detectable amount of the (6R) diastereoisomer, then those claims are invalid under 35 U.S.C. § 112, first paragraph, for failure to satisfy the written description requirement.

The doctrine of prosecution disclaimer prevents patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  The '829 patent Applicants unequivocally defined their invention during prosecution as requiring a mixture of both (6S) and (6R) diastereoisomers and explicitly not covering "pure" (6S) diastereoisomer.  Initially, the Patent Office had rejected the pending claims as anticipated and obvious in light of Rees 1986.  Coblentz Decl. Exh. 2 at SPPI_INNO0000316-318; Exh. 3.  In their appeal of that rejection, the Applicants explained that Rees 1986 describes enzyme-catalyzed reactions that yielded the (6S) diastereoisomer of leucovorin.  Coblentz Decl. Exh. 4 at SPPI_INNO0000350.  To distinguish the claimed mixture from that described in Rees 1986, Applicants argued that:

> More importantly, however, the Rees *et al*. process did not make mixtures of (6S) and (6R) diastereoisomers, as specified in all claims of this case; but instead, prepared only the (6S) diastereoisomer.  Thus, Rees *et al*. is specifically directed to the chiral synthesis of the single (6S) diastereoisomer of leucovorin, i.e., chiral leucovorin (see, e.g., page 120, last sentence of first paragraph; "In this way we obtained nearly 1 g of chiral leucovorin . . .".)  The enzyme method of stereospecific synthesis does not

9

> provide <u>any amount</u> of <u>any mixtures of (6S) and (6R) diastereoisomers</u>.
>
> All pending claims specifically require <u>a mixture of (6S) and (6R) diastereoisomers</u>. Accordingly, no claim is properly rejected under 35 U.S.C. § 102(b) over Rees *et al*.

Coblentz Decl. Exh. 4 at SPPI_INNO0000350-1 (emphasis in original). To further distinguish the claimed mixture from Rees 1986, the Applicants stated:

> "As indicated above, Rees is directed to pure diastereoisomers, and not mixtures thereof." *Id.* at SPPI_INNO0000351.
>
> "Rees *et al*. set out to make the pure (6S) diastereoisomer of leucovorin." *Id.* at SPPI_INNO0000352.
>
> "In sum, the Rees *et al*. process did not make mixtures of (6S) and (6R) diastereoisomers, as specified in Claims 27, 29, and 32-41, but instead, prepared pure (6S) diastereoisomer." *Id.* at SPPI_INNO0000355.

Thus, the Applicants avoided Rees 1986 by telling the Patent Office that the '829 claims require a mixture of both diastereoisomers and do not cover pure (6S) diastereoisomer. Plaintiffs are bound by those arguments. *Rheox, Inc. v. Entact, Inc*., 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations"); *Ekchian v. Home Depot, Inc*., 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection.").

### B. Construction of the "Balance" Claim Terms Should Reflect the Fact That the Claimed Invention Contains a Detectable Amount of (6R) Diastereoisomer.

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "the balance of said compound consisting of the (6R) diastereoisomer" (Claim 1) | the remaining amount of the mixture of (6S) and (6R) diastereoisomers is the (6R) diastereoisomer, and any impurities normally associated with the mixture of (6S) and (6R) diastereomers | the balance of the pharmaceutically acceptable compound consists of a detectable amount of the (6R) diastereoisomer |

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "the balance of said composition consisting of the (6R) diastereoisomer" (Claim 5, 7) | the remaining amount of the mixture of (6S) and (6R) diastereomers is the (6R) diastereoisomer, and any impurities normally associated with the mixture of (6S) and (6R) diastereoisomers | the balance of the pharmaceutically acceptable composition consists of a detectable amount of the (6R) diastereoisomer |
| "the balance of said composition consisting of the (6R) diastereoisomer" (Claim 10, 12) | the remaining amount of the mixture of (6S) and (6R) diastereomers is the (6R) diastereoisomer, and any impurities normally associated with the mixture of (6S) and (6R) diastereomers | the balance of the pharmaceutical composition consists of a detectable amount of the (6R) diastereoisomer |

The parties dispute is the same as that briefed above for the "mixture" terms. For the same reasons as above, specifying that the (6R) diastereoisomer is present in a detectable amount gives meaning to each term in the claims of the '829 patent, provides clarity to the claims, and is consistent with the intrinsic evidence.

### C.     Construction of the Percentage Claim Terms Should Reflect an Upper Limit of (6S) Diastereoisomer No Higher Than 98 Percent.

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "consists of at least 92% by weight of the (6S) diastereoisomer" (Claim 1) | contains 92% or more by weight of the (6S) diastereoisomer | consists of (6S) diastereoisomer having a diastereoisomeric purity of 92% by weight up to 98% by weight |
| "which consists of greater than 95% by weight of the (6S) diastereoisomer" (Claim 2) | contains greater than 95% by weight of the (6S) diastereoisomer | wherein the pharmaceutically acceptable compound consists of (6S) diastereoisomer having a diastereoisomeric purity of 95% by weight up to 98% by weight |
| "consists of at least about | contains 92% or more by | 1) indefinite; |

11

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| 92% by weight of the (6S) diastereoisomer"[3] (Claim 5) | weight of the (6S) diastereoisomer | 2) the pharmaceutically acceptable composition consists of (6S) diastereoisomer having a diastereoisomeric purity of 92% by weight up to 98% by weight |
| "said mixture of (6S) and (6R) diastereoisomers consists of at least about 92% by weight of the (6S) diastereoisomer" (Claim 10) | the mixture of (6S) and (6R) diastereoisomers of leucovorin contains about 92% or more by weight of the (6S) diastereoisomer | 1) indefinite; 2) the mixture of (6S) and (6R) diastereoisomers consists of the (6S) diastereoisomer having a diastereoisomeric purity of 92% by weight up to 98% by weight |

The parties dispute lies with the upper limit of purity, or lack thereof, and whether the inventors are entitled to a purity greater than 98%. Whether the claims are construed to include levoleucovorin of a purity above 98% (6S) diastereoisomer by weight will be relevant both to infringement and to whether the asserted claims are valid under the enablement and written description requirements of 35 U.S.C. § 112. As discussed in detail below, the specification and the prosecution history, including inventor declarations, support InnoPharma's proposed construction that the purity level of the (6S) diastereoisomer is not greater than 98%.

**1.    InnoPharma's Constructions are Consistent With the Specification and Claim Language.**

The '829 patent specification provides guidance regarding the upper limit on the percentage of (6S) diastereoisomer in the claimed invention. For instance, Example 1 of the '829 patent, which is presented in Figure 4, depicts mixtures with 91% and 92% purity of the (6S) diastereoisomer. '829 patent, col. 6, ll. 51-56. Nowhere in the specification or in numerous inventor declarations did the Applicants ever describe performing successive separation steps

---

[3] InnoPharma believes that the "at least about" language in claims 5 and 10 are indefinite for the reasons explained below. If the Court does not find these terms indefinite, then InnoPharma believes these terms should be construed to be consistent with the other percentage claim terms.

resulting in purities above 98%. Foley Decl. at ¶ 29. Thus, the patent does not describe or teach that more than 98% purity of the (6S) isomer can be achieved, (*Id*. at ¶ 26-33), and Plaintiffs are not entitled to a construction that covers above 98% purity.

Moreover, Applicants' intention to claim compositions containing between 2% and 8% (6R) isomer is further evidenced by the decision to specifically claim even more limited percentage ranges in the dependent claims. Unasserted claim 3, for example, covers a pharmaceutical composition "which consists essentially of about 92% by weight of the (6S) diastereoisomer" where the balance is (6R) diastereoisomer, *i.e.*, about 8% by weight (6R) isomer. Claim 4 similarly covers a pharmaceutical composition "which consists essentially of 92% to 95% by weight of the (6S) diastereoisomer" where the balance is (6R) diastereoisomer, *i.e.*, 5% to 8% by weight (6R) isomer. *Phillips*, 415 F.3d at 1314 (unasserted claims can be "valuable sources of enlightenment as to the meaning of a claim term"). Tellingly, while the Applicants expressly targeted these lower purities in their claims, they never pursued claim language such as "greater than 98%" or "greater than 99%" pure. Accordingly, one of skill in the art would have understood the inventors to have invented and claimed mixtures of compositions containing between 2% and 8% (6R) diastereoisomer, and by implication, not claim mixtures considered pure (*e.g.*, Reese 1986).

### 2. InnoPharma's Constructions Are Consistent With the Prosecution History.

#### a. Inventor Declarations Submitted to the Patent Office Support an Upper Limit No Higher Than 98% by Weight of (6S) Diastereoisomer.

During prosecution of the '829 patent, one of the named inventors, Dr. Colin James Suckling, submitted a sworn declaration to the Patent Office to overcome a lack of enablement rejection. Coblentz Exh. 1. Dr. Suckling's representations shed light on the scope of the claims.

*See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct. . .").  The examiner had rejected the claims due to a lack of evidence that the specification enabled (6S) diastereoisomer purities of 95% or greater.  Coblentz Decl. Exh. 1 at SPPI_INNO0000477.  In the declaration, Dr. Suckling presented data that he claimed "demonstrates that . . . diastereoisomeric purities of up to and including 95% are in fact attainable by the present invention."  *Id.* at SPI_INNO0000480. Based on the error limits of two different measurement techniques, Dr. Suckling stated that "the purities are 93.3 ± 3% and 95 ± 3%," concluding that "the purity . . . taking into account the intrinsic error is in the range of about 90-98%."  *Id.* at SPPI_INNO0000482.  Dr. Suckling's declarations establish that the highest purity of (6S) diastereoisomer achieved by the inventors, accepting the upper limit of the error range, is 98%.  One of ordinary skill in the art, however, would have interpreted Dr. Suckling's data to indicate a purity lower than 98% for the (6S) diastereoisomer.  *See* Foley Decl. at ¶¶ 28-33.  Thus, Plaintiffs are not entitled to a construction that provides a purity of (6S) diastereoisomer any higher than 98%.  InnoPharma's proposed constructions reflect this limitation.

### b.    The Applicants Disclaimed Higher Than 98% by Weight (6S) Diastereoisomer.

Further, during prosecution of the '829 patent, the Patent Office rejected the claims in light of the prior art reference Rees 1986.  Coblentz Decl. Exh. 2 at SPPI_INNO0000316-318; Exh. 5 at SPPI_INNO0000158.  The Applicants explained in their appeal of that rejection that Rees 1986 made "pure (6S) diastereoisomer."  Coblentz Decl. Exh. 4 at SPPI_INNO0000351. Arguing to overcome the anticipation and obviousness rejections based on Rees 1986, the

14

Applicants distinguished their invention as "mixtures of (6S) and (6R) diastereoisomers," and not pure (6S) diastereoisomer, as discussed above. *Id.*

A person of ordinary skill in the art would have understood that the mixture described in Rees 1986, which Applicants described as "pure (6S) diastereoisomer," in fact contained about 98% by weight (6S) diastereoisomer and 2% by weight (6R) diastereoisomer. Foley Decl. at ¶¶ 34-59. By disclaiming the levoleucovorin mixture disclosed in Rees 1986, the Applicants necessarily disclaimed levoleucovorin with (6S) diastereoisomer purity down to 98% by weight. *See ERBE Elektromedizin GmbH v. Canady Tech., LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) (finding disclaimer of high flow rates where the inventors distinguished their low flow rate from the prior art reference in order to obtain claim allowance). Thus, the intrinsic evidence supports InnoPharma's constructions, which place an upper limit of no higher than 98% by weight of the (6S) diastereoisomer.

### D. Construction of "A pharmaceutical composition for therapeutic use" Should Reflect a Composition in a Final Form.

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "A pharmaceutical composition for therapeutic use" (Claim 1) | A composition suitable for treating medical conditions | A pharmaceutical composition in a final dosage form for administration to a subject |

The dispute between the parties centers around whether or not the pharmaceutical composition in claim 1 should reflect a final dosage form. As discussed below, the claim language and intrinsic evidence support InnoPharma's proposed construction.

The claim language compels the conclusion that the pharmaceutical composition of claim 1 is in a final dosage form. Claim 1 is not only directed to pharmaceutical compositions for therapeutic use, but also requires "a pharmaceutically acceptable carrier," *i.e.*, a substance that is used to improve the delivery of a drug. The '829 patent specification also describes the

15

combination of a pharmaceutical composition with a pharmaceutical carrier, the combination claimed in claim 1, only in the context of a final dosage form. '829 patent, col. 4, l. 53 – col. 5, l. 30.

Moreover, if the Applicants had intended the pharmaceutical composition recited in claim 1 to include something other than a final dosage form, the patentee could have drafted the claim to look more like claim 10. Claim 10 covers a pharmaceutical composition "for preparing medicaments for therapeutic use." Moreover, claim 10 does not include a pharmaceutically acceptable carrier. Thus, claim 10 does not cover the final form, but instead covers pharmaceutical compositions for preparing medicines. The Court should account for differences in how the Applicants drafted these claims as part of its intrinsic record analysis. In sum, Plaintiffs' proposed construction is not supported by the specification and fails to take the differences in how the Applicants drafted the claims into account.

For at least these reasons, InnoPharma's proposed construction should be adopted.

### E. Construction of the "therapeutic use" Terms in Claims 5-14 Should Be Limited to Treatment of Colorectal Cancer.

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "A pharmaceutical composition for therapeutic use for the treatment of human beings" (claim | A composition suitable for treating medical conditions in human beings | A pharmaceutical composition for the treatment of colorectal cancer in human beings |
| "for therapeutic use for the treatment of human beings" (Claims 5-14) | suitable for treating medical conditions in human beings | for the treatment of colorectal cancer in human beings |

The claim language and specification compel the conclusion that the "therapeutic use" of "substantially pure" (6S) leucovorin in claims 5-14 is for the treatment of colorectal cancer. Claims 5 and 10, and by incorporation claims 6-9 and 11-14, disclose a pharmaceutical composition for therapeutic use, or a pharmaceutical composition for preparing medicaments for

therapeutic use, where the composition is of a quantity, or aggregate quantity, at least sufficient to provide multiple doses of said mixture of (6S) and (6R) diastereoisomers in an amount of 2000 mg per dose.  '829 patent, claims 5-14.  Such limitation to 2000 mg per dose is only applicable to treatment of colorectal cancer, not the generalized treatment of "medical conditions in human beings" as proposed by Plaintiffs.  Indeed, the specification explicitly discloses that the therapeutically effective daily dose of (6S) leucovorin "[f]or treating colorectal cancer . . . is generally in the range from 200 to 2000 mg [per day] together with from 200 to 2000 mg of 5-flurouracil."  *Id.* at col. 5, ll. 25-28.  In contrast, the specification defines the therapeutically effective amount of (6S) leucovorin for folate deficiency as "generally in the range from  2 to 25 mg" and the effective amount for methotrexate rescue as "in the range from 25 to 100mg."  *Id.* at col. 5, ll. 15-25.  Accordingly, given the dosage limitation provided in the claims themselves as well as the disclosures in the specification, the "therapeutic use" terms in claims 5-14 should be construed to mean a "composition for the treatment of colorectal cancer in human beings."

Further, Plaintiffs construe "therapeutic use" to mean "suitable for treating medical conditions in human beings."  Such a construction is vague and ambiguous and is neither supported by the intrinsic nor extrinsic evidence.[4]  For at least these reasons, InnoPharma's construction should be adopted.

---

[4] InnoPharma's construction of the "therapeutic use" terms in claims 5-14 is consistent with the extrinsic evidence.  As its label indicates, Fusilev® has been approved by the FDA for "[u]se in chemotherapy with 5-flurouracil in the palliative treatment of patients with advanced metastatic colorectal cancer," for "[r]escue of high dose methotrexate therapy in osteosarcoma," and for "[d]iminishing the toxicity and counteracting the effects of impaired methotrexate elimination and of inadvertent overdosage of folic acid antagonists."  These are the only approved indications of this drug.

**F.    The Pharmaceutically Acceptable Claim Terms Should Be Given Their Plain Meaning.**

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "a pharmaceutically acceptable compound" (Claim 1) | A compound suitable for treating medical conditions which is not harmful to the recipient thereof | Plain and ordinary meaning |
| "a pharmaceutically acceptable composition" (Claim 5) | A composition suitable for treating medical conditions which is not harmful to the recipient thereof | Plain and ordinary meaning |

InnoPharma proposes that the "pharmaceutically acceptable" claim terms in independent claims 1 and 5 should be given their plain meaning. Neither the claims nor specification provide any special definition of these terms, and there is no basis to redefine them from their commonly understood meanings. *Housey Pharm., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004). Plaintiffs' use of the phrase "not harmful" adds a safety limitation that is not found in the specification. Contrary to Plaintiffs' construction, the specification nowhere states that a pharmaceutically acceptable compound or composition must not "independently harm" patients. And, the Federal Circuit has repeatedly rejected such arguments. *See, e.g., Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 435 Fed. Appx. 927, 934 (Fed. Cir. 2011) (affirming district court's refusal to limit "pharmaceutical composition" claim "to those compositions that are 'safe, effective, and reliable for use in humans[,]'" because "[t]he specification does not require this restrictive construction, nor is this property necessary for patentability."); *Aventis Pharma S.A. v. Hospira, Inc*., 675 F.3d 1324, 1330 (Fed. Cir. 2012) ("Neither the claims, the specification, nor the prosecution history suggest that the claimed perfusion must satisfy certain safety or efficacy standards."); *cf. In re '318 Patent Infringement Litig*., 583 F.3d 1317, 1324 (Fed. Cir. 2009) ("[H]uman trials are not required for a therapeutic invention to be patentable.").

16540320\1

Moreover, the phrase "not harmful" introduces an ambiguity that cannot be resolved. All drugs have side effects, and the specification provides no guidance as to when such effects rise to the level of "harm," which is also a patient-specific inquiry. As in *Mitsubishi* and *Aventis*, Plaintiffs' position should be rejected. The "pharmaceutically acceptable" claims terms should be given their plain meaning, without any incorporation of a safety limitation.

### G. The Claim Terms Using "at least about" Are Indefinite.[5]

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "consists of **at least about** 92% by weight of the (6S) diastereoisomer" (claim 5) | contains 92% or more by weight of the (6S) diastereoisomer | 1) indefinite<br>2) the pharmaceutically acceptable composition consists of (6S) diastereoisomer having a diastereoisomeric purity of 92% by weight up to 98% by weight |
| "said mixture of (6S) and (6R) diastereoisomers is present in said composition in an amount of **at least about** 10 grams" (claims 6, 11) | The pharmaceutical composition contains at least 10 grams of the mixture of (6S) and (6R) diastereoisomers of leucovorin | 1) indefinite<br>2) the pharmaceutically acceptable composition is present in an amount of 10 grams or more |
| "said mixture of (6S) and (6R) diastereoisomers consists of **at least about** 92% by weight of the (6S) diastereoisomer" (Claim 10) | the mixture of (6S) and (6R) diastereoisomers of leucovorin contains about 92% or more by weight of the (6S) diastereoisomer | 1) indefinite;<br>2) the mixture of (6S) and (6R) diastereoisomers consists of the (6S) diastereoisomer having a diastereoisomeric purity of 92% by weight up to 98% by weight |
| "said mixture of (6S) and (6R) diastereoisomers consists of **at least about** 95% by weight of the (6S) diastereoisomer" (claims 7, 12) | the mixture of (6S) and (6R) diastereoisomers of leucovorin contains about 95% or more by weight of the (6S) diastereoisomer | 1) indefinite;<br>2) the mixture of (6S) and (6R) diastereoisomers consists of (6S) diastereoisomer having a diastereoisomeric purity of 95% by weight up to 98% by weight |

---

[5] If the Court finds the "at least about" as they relate to the percent by weight terms are not indefinite, InnoPharma believes these terms should be construed consistent with the terms discussed in Section V.C.

The Federal Circuit has held that claims reciting "at least about" are invalid for indefiniteness where there is there is nothing in the specification, prosecution history, or the prior art to provide any indication as to what range of specific activity is covered by the term "about." *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200 (Fed. Cir. 1991). Based on that premise, Claims 5-7 and 10-12 of the '829 patent are invalid as indefinite under 35 U.S.C. § 112, second paragraph.

### 1.     "at least about" As Used in Claims 5, 7, 10, and 12 is Indefinite.

The terms "at least about 92% by weight of the (6S) diastereoisomer" and "at least about 95% by weight of the (6S) diastereoisomer," as used in claims 5 and 10, and 7 and 12, respectively, are indefinite because their meaning cannot be discerned from any intrinsic evidence concerning the '829 patent, and because the terms did not have a generally understood meaning to persons of ordinary skill in the art at the time of the alleged invention. Further, the meaning of these claim terms is unclear and is an effort by the patentee to recapture ground that was ceded during prosecution of the '829 patent. *See Amgen, Inc. v. Chugai Pharma. Co., Ltd,* 927 F.2d 1200, 1217-18 (Fed. Cir. 1991).

The as-filed claims of the '829 patent recited *inter alia* a "substantially pure diastereoisomer of a derivative of tetrahydrofolic acid or a salt or ester thereof which has a purity of greater than 75%," or "which has a purity greater than 80%"; and "[a] substantially pure (6S) diastereoisomer of leucovorin"; "[a] substantially pure diastereoisomer of synthetic leucovorin" and which "has a purity greater than 90%." Coblentz Decl. Exh. 6 at SPPI_INNO0000047. In response to prior art rejections, Applicants canceled the claims directed to "substantially pure" diastereoisomers, stating that "'[s]ubstantially pure compounds are now defined in the amended claims to consist of greater than 90% by weight of the (6S) diastereoisomer." Coblentz Decl. Exh. 7 at SPPI_INNO0000113. Applicants subsequently argued that "none of the cited

references teaches or suggests an operative process for producing therapeutically useful amounts of the (6S) isomer of greater than 90% purity, . . . ." Coblentz Decl. Exh. 8 at SPPI_INNO0000169. Thus, during prosecution of the '829 patent, Applicants narrowed the claims to recite compositions having a diastereoisomeric purity greater than 90% by weight, and argued that the novelty and nonobviousness of the claims rested on this level of purity.

Claims that included the "at least about" limitation that would eventually issue as claims 5, 7, 10, and 12 of the '829 patent were not added until more than four years into prosecution of the '829 patent. *See* Coblentz Decl. Exh. 9 at SPPI_INNO0000258-260. The claim terms "at least" and "about" were not explicitly defined by Applicants in the intrinsic record. The plain and ordinary meaning of "at least" is "not less than." *See*, *e.g.*, *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995). The plain and ordinary meaning of "about" is "approximately." *See*, *e.g.*, *Merck & Co. v. Teva Pharm. USA, Inc*., 395 F.3d 1364, 1369 (Fed. Cir. 2005). Thus, the plain and ordinary meaning of the terms "at least about" is "not less than approximately."

As discussed above, during prosecution of the '829 patent, Applicants stated that "there is an intrinsic error of plus or minus 3-4% in any of the purities determined by method (ii). In other words the purities are 93.3±3% and 95±3%." Coblentz Decl. Exh. 1 at SPPI_INNO0000482. Therefore, claims reciting a diastereoisomer purity of 92% by weight inherently recite amounts from 89% to 95% by weight. Likewise, claims reciting a diastereoisomer purity of 95% by weight inherently recite amounts from 92% to 98% by weight.

Applicants significantly narrowed the scope of the claims during prosecution of the '829 patent, even going so far as to argue that the novelty and nonobviouness of the claims was based on the prior art failing to disclose compositions consisting of (6S) leucovorin having a

diastereoisomeric purity greater than 90% by weight.  However, claims 5 and 10, which recite "at least about 92% by weight of the (6S) diastereoisomer," inherently cover compositions containing as little as 89% by weight of the (6S) diastereoisomer of leucovorin.  These claims must be construed even more broadly than that based on Applicants' use of the term "about."  However, the intrinsic record provides no objective metric for determining the scope of claims 5, 7, 10, and 12, which include the term "about."  *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)("Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention.").  Further, Applicants' use of the term "about" in claims 5, 7, 10, and 12 of the '829 patent is clearly an attempt to "recapture" ground that was ceded during prosecution, but "gives no hint as to" what purity level above or below 92%±3% by weight or 95%±3% by weight would constitute infringement.  *See Amgen*, 927 F.2d at 1217-18.  "When the meaning of claims is in doubt and there is close prior art, the claims are invalid."  *Id.*, citing *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 453 (Fed. Cir. 1985).  Thus, claims 5, 7, 10, and 12 are invalid as indefinite under 35 U.S.C. § 112, second paragraph.

### 2. "at least about" As Used in Claims 6 and 11 is Indefinite.

Claims 6 and 11 are likewise indefinite under 35 U.S.C. § 112, second paragraph.  The term "an amount of at least about 10 grams" is indefinite because its meaning cannot be discerned from any intrinsic evidence concerning the '829 patent, and because the term did not have a generally understood meaning to persons of ordinary skill in the art at the time of the alleged invention.  The plain and ordinary meaning of the term "about" is "approximately."  However, here, this term is preceded by "at least," the plain and ordinary meaning of which is "not less than."  Further, claims 6 and 11 depend from claims 5 and 10, respectively, which require *inter alia* an amount of at least 4 grams of the claimed composition (*i.e.*, a "quantity at

least sufficient to provide multiple doses . . . in an amount of 2000 mg per dose."). Thus, it is unclear whether "an amount of at least about 10 grams" would include amounts less than 10 grams, and if so, how much. The '829 patent specification presents no objective metric for determining the scope of the term "at least about" in this context. *See Datamize*, 417 F.3d at 1350 ("Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention."). For at least this reason, claims 6 and 11 are indefinite under 35 U.S.C. § 112, second paragraph.

**H.    The Claim Term "polar solvent" is Indefinite.**

| Claim Terms (claim) | Plaintiffs' Construction | InnoPharma's Construction |
|---|---|---|
| "polar solvent" (claim 14) | a solvent with a dielectric constant of 15 or higher | indefinite |

InnoPharma contends that the claim term "polar solvent" is indefinite because it is "not amenable to construction or [is] insolubly ambiguous." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009) (citing *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007)). Indeed, its meaning cannot be discerned from any intrinsic evidence concerning the '829 patent, and the term did not have a generally understood meaning to persons of ordinary skill in the art at the time of the alleged invention. Thus, the term "polar solvent" is a relative term that is too vague to "particularly point out and distinctly claim" the subject matter of the purported invention as required by 35 U.S.C. § 112, second paragraph. *See Standard Oil*, 774 F.2d at 453 (finding the term "partially soluble" to be indefinite.).

Further, Plaintiffs' construction, "a solvent having a dielectric constant higher than 15" is wholly arbitrary. Neither the claims themselves nor the specification provide support for this construction. Specifically, claims 9 and 14 are "product-by-process" claims and require separation using a "polar solvent." The '829 specification discloses that "[s]olvents with which

solvent extraction . . . may be effected include any suitable polar solvent." '829 patent, col. 3, ll. 45-46.  Claims 9 and 14 require no other process limitations.  However, one of ordinary skill in the art would recognize that solvent polarity (*i.e.*, the dielectric constant) can vary widely as a function of temperature or pressure.  Foley Decl. at ¶¶ 63-67.  For instance, the chart below depicts the temperature-dependent variance in the dielectric constant of butan-1-ol, a "polar solvent" suggested in the specification of the '829 patent.[6]  As the chart demonstrates, at temperatures between 10°C and 40°C butan-1-ol is a "polar solvent," as defined by Plaintiffs, whereas at temperatures of 50°C and above butan-1-ol no longer meets the definition of "polar solvent" as construed by Plaintiffs.  In essence, Plaintiffs' construction would create a situation

| Temperature | Dielectric Constant |
|---|---|
| 10°C | 19.5 |
| 20°C | 18.8 |
| 30°C | 16.8-17.6 |
| 40°C | 15.6 |
| 50°C | 14.9 |
| 80°C | 11.4 |
| 100°C | 9.6 |

where use of a solvent at one temperature would be an infringing process, whereas use of this same solvent at a different temperature would not result in an infringing process.  This situation would defeat the "notice" function of claim construction which seeks to define the metes and bounds of a claim so that the public can determine the scope of the patentee's right to exclude. *See Datamize*, 417 F.3d at 1350 ("Some objective standard must be  provided in order to allow the public to determine the scope of the claimed invention.")   Accordingly, because the specification gives no objective measure as to when a process is infringing, the term "polar solvent" is indefinite under 35 U.S.C. § 112, second paragraph.

---

[6] The chart above lists the temperature dependence of the dielectric constant of butan-1-ol. *Available at* http:www.ddbst.com/en/EED/PCP/DEC_C39.php.

## VI.    CONCLUSION

InnoPharma respectfully requests that the Court adopt InnoPharma's proposed constructions.

Dated: May 24, 2013

Respectfully submitted,

/s/ Barry Klayman
Barry M. Klayman (#3676)
COZEN O'CONNOR
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2035
Facsimile:  (215) 701-2209
E-mail: BKlayman@cozen.com

*Attorneys for Defendant,
InnoPharma, Inc.*

Richard T. Ruzich (*Pro Hac Vice*)
COZEN O'CONNOR
333 W. Wacker Drive, Suite 1900
Chicago, IL 60606

Barry P. Golob (*Pro Hac Vice*)
W. Blake Coblentz (*Pro Hac Vice*)
Aaron S. Lukas (*Pro Hac Vice*)
COZEN O'CONNOR
1627 I Street, NW, Suite 1100
Washington, DC 20006

16540320\1